UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEEREN, LLC d/b/a RIDGEKING
APPLE PACKAGING AND STORAGE,
a Michigan limited liability company,

    Plaintiff,

v.

    File No. 1:15-cv-47

    HON. ROBERT HOLMES BELL

CHERRY GROWERS, INC., a
Michigan corporation,

    Defendant.
    _____/

## **O P I N I O N**

Plaintiff Heeren, LLC's business involves selling and shipping perishable agricultural commodities such as fruits and vegetables. Defendant Cherry Growers, Inc. (CGI) has purchased apples from Heeren since 2009, when CGI's president and general manager Eric MacLeod entered into negotiations with Bruce Heeren, the vice president of Heeren, LLC responsible for negotiating the sale of fruit on Heeren, LLC's behalf. Both Heeren, LLC and CGI are licensed under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a, *et seq*. (PACA).

When Heeren makes a shipment, it provides a bill of lading at the time of delivery, "which is the ordinary and usual billing method used by the parties." (Compl. ¶ 11, ECF No. 1.) The bill of lading provides that CGI must make payments within 10 days. It further states:

> The perishable agricultural commodities listed on the invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received. Buyer agrees that interest shall accrue on past due balances at 1.5% per month (18% per annum). Buyer agrees to pay all costs of collections including attorney fees.

(Bill of Lading, ECF No. 25-4, PageID.184.) No other writing between the parties exists evidencing payment terms.

MacLeod stated he never discussed the terms listed on the bill of lading with any Heeren employee, (MacLeod Dep. 39-40, ECF No. 25-2), and that despite the terms listed on the bill of lading, payments were routinely made outside of the 10-day period. Bruce Heeren stated that, normally within two weeks, Heeren, LLC would receive a "progress payment" from CGI. (B. Heeren Dep. 50, ECF No. 26-2.) The progress payments were less than the full price of the apples. It would take much longer than 10 days for Heeren to receive the full payments. For instance, during the 2010 crop season, Heeren did not receive full payment until 19 months had passed. Bruce Heeren stated that the "terms were still ten days," but "[a]s long as payments kept coming, I was accepting that they were working on paying off their bill." (*Id.* at 56.)

In 2013, CGI was still making payments on apples purchased during the 2011 crop season. Still, Bruce Heeren called MacLeod to inquire as to whether CGI planned to purchase apples for the 2013 crop year. MacLeod's notes state:

> Bruce asked about our program. I told him we do not yet have a price, due to unsettled market conditions . . . I also told him it could be 15-16 months before we pay off this crop, due to our need to replenish our cash flow . . . .

(MacLeod Notes, ECF No. 26-7, PageId.426.) Heeren, LLC nevertheless sent CGI apples for the 2013 crop year. While the parties dispute the amount that CGI owes for these apples, CGI "admits that it still owes Heeren a balance." (Def.'s Resp. to Pl.'s Mot. Summ. J. 2, ECF No. 26.)

As a result of CGI's failure to pay, Heeren, LLC filed a complaint in this Court alleging (1) that CGI has violated its PACA obligations and, therefore, Heeren's PACA trust claim is superior to any of CGI's other non-PACA creditors' rights, and (2) that CGI's failure to pay constitutes a breach of the agreement between the parties. Heeren, LLC filed a motion for summary judgment. CGI has filed a response (ECF No. 26), contending that Heeren, LLC is not entitled to summary judgment, and, moreover, that CGI is itself entitled to summary judgment on the PACA claim. For the reasons that follow, each party's motion will be denied.

## I. Standard of Review

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to

determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, a "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits[.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

The Sixth Circuit has held that "'[t]he fact that both parties make motions for summary judgment . . . does not require the Court to rule that no fact issue exists.'" *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (quoting *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948)). "When parties file cross-motions for summary judgment, 'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party

waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 270 (3d ed. 1998)).

## II. The Perishable Agricultural Commodities Act

The Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c), was enacted "to protect unpaid sellers of perishable agricultural commodities." *Overton Distribs. v. Heritage Bank*, 340 F.3d 361, 364 (6th Cir. 2003). "[D]ue to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify." *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995).

One way the statute protects these sellers is through the creation of a non-segregated, floating statutory trust in the sellers' favor. *Id.* "Ordinary principles of trust law apply to trusts created under PACA, so that for instance the trust assets are excluded from the estate should the dealer go bankrupt." *Sunkist Growers Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997). "Through this trust, the sellers of the commodities maintain a right to recover against the purchasers superior to all creditors, including secured creditors." *Endico Potatoes*, 67 F.3d at 1067 (2d Cir. 1995). "The trust automatically arises in favor of a produce seller upon delivery of produce and is for the benefit of all unpaid suppliers or sellers involved in the transaction until full payment of the sums owing has been received." *In re Milton Poulos, Inc.*, 947 F.2d 1351, 1352 (9th Cir. 1991) (citations omitted). "In return for its protections,

PACA establishes strict eligibility requirements." *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002).

## A. Heeren, LLC Satisfied PACA's Notice Requirement

The first "strict eligibility requirement" requires a seller to provide notice to the buyer that it intends to preserve its trust benefits. *Overton*, 340 F.3d at 365. A seller can do this in one of two ways. First, a seller may file a "written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker . . . as set forth in the regulations issued by the Secretary [of the Treasury Department]." 7 U.S.C. § 499e(c)(3); 7 C.F.R. § 46.46(1). Alternatively, the seller may preserve trust benefits using "ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust." 7 U.S.C. § 499e(c)(4). When using the second method, the bill or invoice statement must contain on the face of the statement the following:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

*Id.* "The purpose of section 499e(c) is to ensure that the buyer is aware that its purchase is subject to the PACA trust provisions." *Atlantic Coast Produce, Inc. v. McDonald Farms, Inc.*, No. Civ.A.5:04, 2005 WL 1785137, at *1 (W.D. Va. 2005).

Heeren, LLC has satisfied this requirement. The bills of lading sent by Heeren, LLC, which were the "ordinary and usual billing or invoice statements," contained the required language providing CGI with notice that Heeren, LLC intended to preserve the trust. *See id.* ("[B]ills of lading provide sufficient notice to the buyer to comply with section 499e(c)(4) and to properly preserve its PACA trust rights."). Further, "CGI does not dispute that the bills of lading include the requisite statutory language indic[a]ting the produce sold is subject to PACA . . . CGI also does not dispute that Heeren sent a bill of lading to CGI for each shipment of appl[e]s for the 2013 crop year." (Def.'s Resp. to Pl.'s Mot. Summ. J. 6.)

**B. PACA's Prompt Payment Requirement**

A principal justification given by Congress for providing PACA trust benefits to sellers of produce is "the need to protect small dealers who require prompt payment to survive." *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002). As such, the second requirement imposed on sellers intending to preserve PACA trust eligibility is that a "PACA supplier must be selling produce on a cash or short-term credit basis." *Id.*; *see also Overton*, 340 F.3d at 367 ("Congress's purpose in enacting PACA was to protect sellers delivering their produce on essentially cash terms, not to provide protection to sellers who are willing to extend payment terms beyond the statutory maximum.").

The prompt payment requirement provides:

> **(1)** The times for prompt accounting and prompt payment are set out in § 46.2(z) and (aa). Parties who elect to use different times for payment must reduce their agreement to writing before the transaction and maintain a copy of their agreement in their records, and the times of payment must be disclosed on invoices, accountings, and other documents relating to the transaction.
>
> **(2)** The maximum time for payment for a shipment to which a seller, supplier, or agent can agree, prior to the transaction, and still be eligible for benefits under the trust is 30 days after receipt and acceptance of the commodities . . . .

7 C.F.R. 46.46(e). The time for prompt accounting and prompt payment set out in § 46(z) and (aa) is 10 days. The Sixth Circuit has stated, "if the parties agree to payment terms greater than 10 days after acceptance, *but in no event* more than 30 days after acceptance, this agreement must be in writing." *Overton Distribs.*, 340 F.3d at 365 (emphasis added).

In April 2011, the United States Department of Agriculture (USDA) amended its regulations interpreting PACA. *See* 76 Fed. Reg. 20217-01 (Apr. 12, 2011). The amendment explicitly distinguishes between post-default agreements extending payment terms outside of 30 days and pre-transaction agreements doing the same. Prior to the amendment, interpreting 7 C.F.R. § 46.46(e)(2), "several federal courts" had held that sellers waived their PACA trust rights by agreeing—*after* the buyer had defaulted on payments—to extend payment terms outside of the 30-day statutory maximum. *See* 76 Fed. Reg. 20217 n.1 (collecting cases). The USDA, explaining the amendment, stated that "[i]t is our interpretation that § 46.46(e)(2), like paragraph (e)(1) of the regulations (7 CFR 46.46(e)(1) and (e)(2)), addresses pre-transaction agreements only." *Id.* at 20217. Accordingly, after the

buyer has defaulted, sellers who otherwise meet the PACA trust eligibility requirements "will not forfeit eligibility under the trust by agreeing *in any manner* to a schedule for payment of the past due amount or by accepting a partial payment." 7 C.F.R. § 46.46(e)(3) (emphasis added). This is a result of the "significant difference between the relative positions of buyers and sellers before a transaction, versus their positions after a buyer defaults on payments." 76 Fed. Reg. 20218. "The trust is intended to provide protection to the unpaid seller whose bargaining position has changed for the worse after delivering its produce to a buyer. We do not believe that a seller's perfected trust rights should be lost because the seller enters into a payment arrangement, in an attempt to collect a debt, *after* the buyer has violated the PACA's prompt payment requirement." *Id.* at 20219 (emphasis added).

The amendment did not otherwise discuss the effect of pre-transaction agreements extending payment terms outside of the 30-day statutory maximum, which is the primary issue in this case. CGI argues that, despite the 10-day payment term on the invoices, "the parties did not agree to payment terms required by PACA" and, therefore, that Heeren, LLC waived its PACA trust benefits. CGI bases this argument on (1) the parties' course of dealing, wherein CGI routinely made, and Heeren routinely accepted, payments after 30 days; and (2) the allegation that, prior to the 2013 crop year, Heeren agreed to send apples to CGI after being informed that it could take 15-16 months for CGI to make payments, "and by doing so, implicitly acquiesced to payment terms . . . well past the 30 day maximum permitted under PACA." (Def.'s Resp. to Pl.'s Mot. Summ. J. 15-6, ECF No. 26.) Heeren,

9

on the other hand, argues that it complied with the prompt payment requirement by listing a 10-day payment period on its invoices. Further, Heeren argues that neither an oral agreement nor the parties' course of conduct can cause a seller to waive its trust rights, stating "only written agreements can cause a seller to lose its PACA trust rights." (Pl.'s Mot. Summ. J. 15 (citing *La Grasso Bros., Inc. v. Am. Foodservice, L.L.C.*, No. 10-10711, 2011 WL 891221, at *5 (E.D. Mich. Mar. 11, 2011)).)

### 1. Effect of Non-Written, Pre-Transaction Agreements

The primary issue in this case is whether–in the absence of a written agreement extending the payment terms–Heeren's course of dealing (routinely accepting payments outside of 30 days) and Heeren's willingness to send apples to CGI, after allegedly being informed that CGI would not be able to make payments within 30 days, waived Heeren's PACA trust rights. The Sixth Circuit has not yet addressed whether a non-written, pre-transaction agreement to extend payment terms outside of the 30-day statutory maximum waives a seller's PACA trust rights. *La Grasso Bros.*, 2011 WL 891221, at *6 n.3.

Although not specifically addressing pre-transaction agreements, four circuit courts, which made their holdings prior to the 2011 PACA regulation amendments, have found that non-written agreements, including course of conduct, do not cause a PACA trust beneficiary to lose its PACA rights.[1] *See Bocchi Americas Assocs., Inc. v. Commerce Fresh Mktg.*, 515

---

[1] As Heeren, LLC notes, these cases "pre-date the amendment to the regulations clarifying that post-default written agreements will not cause a seller to lose it PACA trust rights. Thus, the portions of the cited cases addressing whether PACA trust rights are lost due to a post-default written agreement have been rendered 'obsolete' by the 2011 rule changes." (Pl.'s Mot. Summ. J. 14 n.1.)

F.3d 383, 390-91 (5th Cir. 2008) ("[W]aiver or forfeiture of PACA trust rights by entering into an extension agreement requires an agreement in writing."); *Patterson Frozen Foods*, 307 F.3d at 669-70 ("[A]n oral agreement for an extension or a course of dealing allowing more than 30 days will not abrogate a PACA trust."); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 205 (3d Cir. 1998) ("[A] supplier's failure to reduce to writing an agreement to extend the payment term does not disqualify that supplier as a PACA trust beneficiary."); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781-82 (8th Cir. 1991) ("[O]ral agreements have no effect on produce sellers' trust protection."). The Third Circuit made clear, however, that its decision did not reach "the issue of what would happen if the oral extension provided for a payment period *in excess of 30 days* because that situation is not before us in this case." *Idahoan Fresh*, 157 F.3d at 205 n.8.

The Eighth Circuit is the only circuit that provided substantial reasoning for this interpretation. There, the court stated:

> [A] buyer who enters into oral agreements to extend the time for payment beyond ten days makes arrangements to commit violations of the prompt payment provisions of PACA. Consequently, when [the buyer] entered into agreements with [the sellers] to pay for perishables not in ten days but in forty-five days and thirty days, respectively, it engaged in violations of PACA. It would be incongruous to disregard oral agreements for purposes of enforcing PACA but recognize them for the purpose of voiding the sellers' protection under the trust."

*Hull*, 924 F.2d at 782. The court also noted that a "liberal construction" of the statute is

appropriate because it is remedial legislation. *Id.* The court framed the purpose of PACA in a general manner so as to protect sellers and their agents. *Id.*

The Second Circuit, however, adopted a narrower view of PACA's purpose, stating that "Congress's clearly expressed intention [is] to extend trust protection solely to cash and short-term credit transactions." *Am. Banana Co., Inc. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 46 (2d Cir. 2004) (citing 7 U.S.C. § 499e(c); 7 C.F.R. §§ 46.46(e), 46.2(aa)). Based on this express purpose, the court stated that it "cannot interpret this regulation to mean that parties are free to enter into agreements that violate PACA's prompt payment rules as long as they do not reduce their agreements to writing." *Id.* "[A] failure to reduce to writing an agreement that violates PACA, should not result in the preservation of the trust, where the same agreement, if memorialized, would have resulted in forfeiture of such protection." *Id.* at 46-47. Accordingly, the court found that where a seller "agrees—orally or in writing—to a payment period exceeding thirty days, it forfeits trust protection." *Id.* at 47.

Further, after the 2011 amendment to PACA's regulations, two district courts have held that a *pre-transaction*, non-written agreement extending payment terms outside of the 30-day statutory maximum waives the seller's PACA trust rights.

In *Spada Properties, Inc. v. Unified Grocers, Inc.*, No. 3:13-cv-1760, 2015 WL 4662930 (D. Or. Aug. 6, 2015), the buyer and seller had a written agreement stating that payment was due within 10 days of delivery. *Id.* at *24. The buyer argued that the seller's longstanding practice of accepting late payments "constitutes a continuing series of *pre-*

*default* agreements in violation of 7 C.F.R. § 46.46(e)." *Id.* (emphasis in original). The court stated that the "relevant question is whether [the buyer and seller] 'agreed,' *pre-default*, through their course of dealing or otherwise, that payments could be made after the 30-day statutory maximum." *Id.* (citing *A&J Produce Corp. v. City Produce Operating Corp.*, No. 10 Civ. 5610, 2011 WL 6780614 (S.D.N.Y. Dec. 23, 2011)) (holding that the parties' course of dealing created a question of fact as to whether the seller had "agreed" to payment terms in violation of PACA). The court's determination that a seller's PACA trust rights can be waived through pre-transaction, non-written agreements relied on the USDA's interpretation of its own regulation, which states:

> "In the context of the PACA trust, the rights to make a claim against the trust are vested in the seller, supplier, or agent, *who has met the eligibility requirements* of paragraph (e)(1) and (e)(2) § 46.46. The seller, supplier, or agent remains a beneficiary of the trust *until the debt owed is paid in full* as stated in section 5(c)(4) of the statute. An agreement to pay the antecedent debt in installments is not considered payment in full. Thus, we do not believe that a post-default payment agreement should constitute a waiver of a seller's *previously protected trust rights*."

*Id.* at *12 (quoting 76 Fed. Reg. 20217-18) (alterations in original). The court stated,

> [T]he emphasized text . . . indicates . . . the 2011 amendments limited post-default PACA protection to those PACA sellers with previously protected trust rights who had met the eligibility requirements under § 46.46 . . . PACA sellers may still lose PACA trust rights through pre-default agreements that do not meet § 46.46's requirements.

*Spada*, 2015 WL 4662930, at *12.

13

### 3. This Court Adopts the Second Circuit's Position

While the Sixth Circuit has yet to address whether a pre-default, oral agreement can waive a seller's PACA trust rights if the payment terms are extended outside of 30 days, it has adopted a similar viewpoint of PACA's purpose as the courts in *Spada* and *American Banana*. *See Overton Distribs.*, 340 F.3d at 367 ("Congress's purpose in enacting PACA was to protect sellers delivering their produce on essentially cash terms, not to provide protection to sellers who are willing to extend payment terms beyond the statutory maximum."). In *Overton*, the seller's invoices originally provided for payment within 25 days of the buyer's receipt of the produce. Four years later, the seller unilaterally changed the invoice "to provide that payment was to be received within 10 days after the end of each calendar month." *Id.* at 364. This allowed for payments to be made as late as 40 days after the buyer received the goods. The court noted that the parties clearly agreed in writing to a 25-day payment period originally, and that those terms—rather than the terms unilaterally added by the seller—were required to be listed on the invoices: "[The seller] cannot have it both ways. It cannot, on the one hand, list terms on the invoices that are not only different from those mutually agreed upon, but also permit payment outside of PACA's requirements, and then on the other hand argue that it has substantially complied with PACA." *Id.* at 366-67. The court noted that the seller "was of course free as a business matter to provide lenient payment terms to [the buyer], but by doing so it failed to preserve its trust benefits under PACA." *Id.* at 367.

Given *Overton*'s indication that the Sixth Circuit interprets PACA to protect only those sellers who deliver their produce on essentially cash terms, 340 F.3d at 367, the Court "cannot interpret [PACA] to mean that parties are free to enter into" pre-transaction "agreements that violate PACA's prompt payment rules as long as they do not reduce their agreements to writing." *Am. Banana*, 362 F.3d at 46. Such an interpretation "amounts to a claim that, as long as PACA buyers and sellers include PACA-compliant language in their invoices, any *de-facto* agreements to other than short-term credit arrangements based on a long-standing course of conduct are still protected by PACA." *Spada*, 2015 WL 4662930, at *12.

As the court in *Spada* recognized, this position is consistent with the USDA's interpretation of PACA regulations. 2015 WL 4662930, at *12. "In the context of the PACA trust, the rights to make a claim against the trust are vested in the seller, supplier, or agent *who has met the eligibility requirements of paragraph (e)(1) and (2) of § 46.46.*" 76 Fed. Reg. 20217 (emphasis added). A seller who agrees, *prior to the transaction*, to accept payments more than 30 days after receipt and acceptance of the commodities has not met the eligibility requirements of 7 C.F.R. 46.46(e)(2); *see also Overton*, 340 F.3d at 365 ("[I]f the parties agree to payment terms greater than 10 days, <u>but in no event</u> more than 30 days after acceptance, this agreement must be in writing.") (emphasis added). While "[a]ny agreement reached after default is not an arm's length transaction," 76 Fed. Reg. 20219, a seller who agrees, before the buyer has defaulted, to accept payments outside of 30 days makes a

15

knowing and voluntary decision, while in an equal bargaining position with produce purchasers. As the *Overton* court noted, sellers are "of course free as a business matter to provide lenient payment terms" to buyers, but by doing so, they fail to preserve their trust rights under PACA. 340 F.3d at 367.

Accordingly, the Court finds the Second Circuit's interpretation of PACA most persuasive: a seller who enters into a pre-transaction, non-written agreement permitting the buyer to make payments outside of 30 days fails to preserve its trust rights under PACA.

**4. Application**

A question of fact exists regarding whether Heeren and CGI entered into a non-written agreement permitting CGI to make payments outside of 30 days. Bruce Heeren acknowledged that payments were often made outside of 30 days, but stated that this never changed Heeren, LLC's payment terms:

> Q: . . . During this process, did Eric [MacLeod] communicate to you when they would expect to have these shipments paid for, for this particular crop year? Did he indicate any projected timeframe in which they would have those shipments paid off?
>
> A: He said they were having some difficulties and they would keep trying to make payments. As long as payments kept coming, I was accepting that they were working on paying off their bill.
>
> Q: But you would agree –
>
> A: *But it didn't change my terms. My terms were still ten days.*
>
> Q: Your terms were ten days?

> A: Correct.
>
> Q: But you would agree –
>
> A: I wasn't—I wasn't going to run down and sue Cherry Growers to collect my money as long as they were making payments.

(B. Heeren Dep. 56, ECF No. 25-9) (emphasis added). Similarly, he stated, "We have ten days. That's our terms. Do I race down to the courthouse if I am not paid in ten days? No, because there is a lot of customers that don't pay in ten days." (*Id.* at 90.)

CGI, on the other hand, argues that "[a]ny assertion by Heeren that ten-days controlled the payment terms between the parties is completely without merit and is contradicted by the parties' course of conduct." (Def.'s Resp. to Pl.'s Mot. Summ. J. 16.) Further, CGI argues that for the 2013 crop year, Bruce Heeren "was told that CGI would not be making payments within 10 days of each shipment as per the bills of lading well prior to the time that any shipments were made for the 2013 season, and agreed to ship CGI the apples with this knowledge." (*Id.* at 17.)

Because a reasonable fact finder could conclude that the parties' conduct and conversation prior to the 2013 crop year established a pre-transaction agreement to extend the payment terms outside of 30 days, Heeren's motion for summary judgment on this issue will be denied.

Given Bruce Heeren's testimony that he never agreed to extend payment terms outside of the ten-day statutory maximum, and that he only agreed to accept payments outside of 30

17

days *after* CGI had defaulted, CGI's motion for summary judgment on the issue will also be denied.

### III. Heeren's Damages Claim

CGI does not dispute that it owes Heeren, LLC for the unpaid apples. CGI contends, however, that it owes $112,840.70. Heeren, LLC argues that it is owed $151,772.32. Throughout the business relationship, CGI would set a "target price" for the apples, which is "established by known and expected market conditions, by competitive intel." (MacLeod Dep. 42, ECF No. 26-1.) The target price would sometimes change over the course of the year. (B. Heeren Dep. 72, ECF No. 26-2.) There was no deadline for CGI to set the target price. It was established "whenever [its] board met and made their final determination." (*Id.* at 85.)

The final target price for the 2013 crop year was set on April 24, 2014. On July 3, 2014, CGI sent a grower statement informing Heeren, LLC that CGI owed a net balance of $120,903.21, in addition to a $30,869.11 capital call charge. (Grower Statement, ECF No. 26-8.) CGI then sent a "revised statement" that removed the $30,869.11 charge. The revised statement also lowered the net balance owed to $112,840.70. "That was a reflection of the target pricing of 7 and 9 cents respectively for soft and hard varieties compared to the previous statement where [CGI] used a bookmark number of 8 and 10 cents." (MacLeod Dep. 61, ECF No. 26-1.) MacLeod stated that June 2014 "was a very traumatic month" and

18

"putting the target pricing in [the first statement] that was approved at the April meeting was not a priority, given everything else." (*Id.* at 62.)

Heeren, LLC argues that "CGI's claim of mistake is dubious, at best." (Pl.'s Mot. Summ. J. 16.) That may be true. But given the record before the Court, it is not clear whether the original grower statement was, as Heeren contends, the final contract between the parties or, as CGI contends, an oversight that did not include the finalized crop pricing. Accordingly, this issue is also best left for trial.

### IV. Attorney Fees, Costs, and Interest

Heeren next contends that "this Court should award Heeren interest and attorney's fees as part of the PACA claim." In a PACA case, "where the parties' contracts include a right to attorneys' fees, they can be awarded as 'sums owing in connection with' perishable commodities transactions under PACA." *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 709 (2d Cir. 2007) (citing 7 U.S.C. § 499e(c)(2)). Invoices can create an enforceable contract providing for attorneys' fees. *See id.* Further, a plaintiff may also collect prejudgment interest in connection with its PACA claim. *La Grasso Bros.*, 2011 WL 891221, at *6.

Given the Court's finding that a question of fact exists as to whether Heeren has brought a meritorious PACA claim, and the fact that the amount of interest will differ depending on the amount that CGI is found to owe Heeren, an analysis of attorney's fees, costs, and interest associated with the PACA claim is premature.

19

## V. Breach of Contract

Lastly, Heeren argues that "Count II of Plaintiff's Complaint seeks a money judgment for breach of the contract between the parties. For all of the reasons set forth above, summary judgment is warranted on that claim as well in the amount of $237,376.17." The figure provided by Heeren consists of the $151,772.32 Heeren argues it is owed in damages, as well as the interest, costs, and attorney's fees Heeren argues it is owed.

As stated by the Court, issues of fact remain as to the total amount in damages owed to Heeren and whether Heeren is entitled to interest, costs, and attorney's fees related to the PACA claim. Accordingly, Heeren's motion for summary judgment on this issue will be denied.

## VI.

For the reasons stated, both Plaintiff's and Defendant's motions for summary judgment will be denied. An Order will enter consistent with this opinion.


Dated: December 23, 2015                    /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE