UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEEREN, LLC d/b/a RIDGEKING
APPLE PACKAGING AND STORAGE,

      Plaintiff,

                                          Case No. 1:15-cv-47

v.

                                          HON. ROBERT HOLMES BELL

CHERRY GROWERS, INC.,

      Defendant.
_____/

## **O P I N I O N**

      This case involves a claim under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499 ("PACA") and an accompanying breach of contract claim. On December 23, 2015, the Court issued an opinion denying both parties' motions for summary judgment. (12/23/2015 Op., ECF No. 29.) The parties' motions for summary judgment centered on an issue of statutory interpretation: whether, under PACA, a pre-default, non-written agreement to extend payment terms outside of 30 days waives a seller's PACA trust rights. The Sixth Circuit has not weighed in on the issue. This Court, adopting the position of the Court of Appeals for the Second Circuit, determined that "a seller who enters into a pre-transaction, non-written agreement permitting the buyer to make payments outside of 30 days fails to preserve its trust rights under PACA." (12/23/2015 Op. 16.) The Court found that a question

of fact existed as to whether such an agreement was entered into between Plaintiff Heeren, LLC and Defendant Cherry Growers, Inc. A bench trial was held on February 3, 2016, to resolve this question, as well as questions concerning the amount of damages resulting from the breach of contract.

## I. The Parties' Contractual Relationship

This case arises out of Defendant's failure to pay Plaintiff for apples purchased during the 2013 crop year. Defendant does not dispute that it owes Plaintiff money. The issues of contention concern how much money Defendant owes, and whether the contractual agreement between the parties resulted in a waiver of Plaintiff's PACA trust rights.

The parties had done business together since 2009. The parties' obligations to each other were not, however, spelled out neatly in a written contract. The parties instead operated on a more informal basis. Typically, prior to entering into an agreement to buy and sell apples, the parties would discuss a "target price" for the apple shipments. After the target price was agreed on, Plaintiff would ship the apples to Defendant. With each shipment, Plaintiff provided a bill of lading. The bill of lading states the shipping method, an order number, the quantity of the crop, the total weight, the payment terms, and a product description. The bill of lading also contains language designed to preserve Plaintiff's PACA trust rights:

> Any claims for shortage, damage or condition will not be honored unless the problem is reported in writing to seller within 48 hours (forty eight) of receipt of the product and a timely U.S.D.A. Inspect is performed on the product when requested by seller. The perishable agricultural commodities listed on this

> invoice are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received. Buyer agrees that Interest shall accrue on past due balances at 1.5% (18% per annum). Buyer agrees to pay all costs of collections including attorney fees.

(3/20/2014 Bill of Lading, ECF No. 25-4.) The payment terms on the bill of lading state: "NET 10 DAYS." (*Id.*) After receiving the apples, Defendant performs an inspection and issues a settlement statement to Plaintiff that states the grade of the apples, how many pounds were delivered, and how much is owed based on the target price. Later in the year, the target price is finalized.

Throughout the course of the parties' relationship, payments on the apples were rarely, if ever, made within 10 days of receipt. In fact, Defendant regularly made payments months, or even years, after receiving the apples. Prior to this lawsuit, Plaintiff never once attempted to enforce a 10-day payment period or collect interest on payments made after 10 days.

By 2013, the crop year at issue, Defendant was still making payments on crops received in 2011. Bruce Heeren, of Plaintiff Heeren, LLC, approached Eric MacLeod, the president and general manager of Defendant Cherry Growers, Inc., to see whether Defendant was interested in purchasing crops in 2013. MacLeod explicitly told Heeren that Defendant was interested, but would not be able to make payments for fourteen to sixteen months. Subsequently, the parties agreed on a target price and agreed that Plaintiff would sell Defendant apples for the 2013 crop year. When Defendant shipped the apples to Plaintiff,

3

as was customary, Defendant attached a bill of lading. The bill of lading, as it always did, stated that payment terms were "Net 10 days." And as was always the case, the parties never discussed the payment terms on the bill of lading.

## II. PACA Trust Rights

The first issue before the Court is whether Plaintiff preserved its PACA trust rights. The parties do not dispute that, because the contract is for the sale of goods—apples, to be specific—the terms of the contract are governed by Article 2 of Michigan's Uniform Commercial Code ("UCC"), Mich. Comp. Laws § 440.2101. Thus, to determine whether Plaintiff preserved its PACA trust rights, the Court must determine whether, under the UCC, the payment terms agreed upon by the parties were in compliance with PACA's "prompt payment" requirement. The Sixth Circuit has noted:

> Thirty days is the maximum allowable payment term under PACA regulation 7 C.F.R. 46.46(e)(2), which provides as follows: "The maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities. . . ." This limitation exists because the statute is intended to protect only those produce sellers making short-term credit arrangements. H.R. Rep. No. 98-543 at 7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410 ("[T]he committee does not intend the trust to apply to any credit transaction that extends beyond a reasonable period.").

*Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003). The "relevant question is whether [the buyer and seller] 'agreed,' *pre-default*, through their course of dealing or otherwise, that payments could be made after the 30-day statutory maximum."

*Spada Props., Inc. v. Unified Grocers, Inc.*, No. 3:13-cv-1760, 2015 WL 4662930, at *13 (D. Or. Aug. 6, 2015).

Defendant argues that the prompt payment requirement was not met because the parties' course of dealing in prior transactions (where Plaintiff never enforced nor discussed a 10-day payment period) and the conversation between Bruce Heeren and MacLeod (where MacLeod informed Heeren that payments would not be made for 14 to 16 months) show that the parties entered into a pre-transaction, non-written agreement to extend payment terms outside of the 30-day window set forth in 7 C.F.R. § 46.46(e)(2). Plaintiff, on the other hand, contends that the language set forth in the bill of lading governs and, therefore, Plaintiff satisfied the prompt payment requirement. Plaintiff contends that it always understood the payment terms to be 10 days.

The Court agrees with Defendant. "A valid contract requires a meeting of the minds on all essential terms." *FLF Co., Inc. v. Perry*, No. 264397, 2006 WL 3020257, at *1 (Mich. Ct. App. Oct. 24, 2006) (citing *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992)). "A meeting of the minds is judged by an objective standard, *considering the express words of the parties and their visible acts* rather than their subjective states of mind." *Oceguera v. Seaway Cmty. Bank*, No. 298174, 2011 WL 3115786, at *2 (Mich. Ct. App. July 26, 2010) (emphasis added) (citing *Kloian v. Domino's Pizza, LLC*, 733 N.W.2d 766 (Mich. Ct. App. 2006)).

First, the express words of the parties favor a finding that the payment terms agreed upon were 14 to 16 months rather than 10 days. Plaintiff does not dispute that MacLeod expressly told Bruce Heeren that payments would not be made for 14 to 16 months. After hearing testimony from both Heeren and MacLeod at trial and examining the record in its entirety, the Court finds that the agreement to engage in a business relationship during the 2013 crop year was contingent on a 14 to 16 month payment period. (*See, e.g.*, MacLeod Dep. 40 ("I wanted to put it out on the table now, instead of later and risk disappointing him later, that we would take at least 14 to 16 months to pay for this [2013] crop.")). This payment period was agreed upon and understood before the parties agreed to a target price or agreed to the quantity of apples. The inclusion of boilerplate language on the bill of lading, which expressly contradicts the payment terms agreed upon, and which the parties never discussed, does not change the fact that the parties had agreed upon payment terms outside of 30 days prior to entering into the transaction.

Second, the visible acts of the parties also indicate that the payment terms agreed upon were 14 to 16 months rather than 10 days. Plaintiff, after being informed that Defendant would not be able to make payments for 14 to 16 months, shipped apples to Defendant anyway. Plaintiff was free to do so, but Plaintiff was not free to agree to payment terms outside of 30 days, and then argue that it is still entitled to the protections of PACA. *See Overton Distribs.*, 340 F.3d at 367 ("Overton was of course free as a business matter to provide lenient payment terms to Quality, but by doing so it failed to preserve its trust

benefits under PACA."); *see also Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002) (noting that a principal justification given by Congress for providing PACA trust benefits to sellers of produce is "the need to product small dealers who require prompt payment to survive"). Moreover, Plaintiff never once discussed a 10-day payment term or attempted to collect payments within 10 days. Only after more than 14 to 16 months had passed did Plaintiff attempt to collect payments. This action (or lack thereof) also indicates that the parties had agreed to payment terms outside of 10 days.

Bruce Heeren's subjective belief that the payment terms were always 10 days conflicts with the express words spoken and agreed upon between the parties and with the parties' visible actions. Accordingly, the Court finds that the pre-default, non-written agreement to payment terms outside of 30 days, which occurred during the conversation between MacLeod and Heeren, waived Plaintiff's PACA trust rights.[1]

### III. Breach of Contract Damages

The parties also dispute the amount of damages owed to Plaintiff for apples received by Defendant during the 2013 crop year. Defendant does not dispute that it breached the contract and owes money, but does dispute the amount owed.

---

[1] Plaintiff has expressed concern that such a holding will alter its industry, and require produce sellers to immediately rush to court if a late payment is made, rather than attempt to work out a compromise with the buyer. The Court does not foresee such a result. This Court's holding stands for the proposition that a seller who, *before* entering into a transaction, is told that a buyer will not make payments within 30 days, yet agrees to do business anyway, is not entitled to PACA's protections. The law is clear that, *after* a buyer has defaulted, the seller can agree to accept late payments and to accommodate the buyer. When a buyer and seller have an understanding that payments will be made within 30 days, and the buyer does not live up to its end of the bargain, the seller does not have to rush to the courtroom on day 31. But that is not what happened in this case. Here, Plaintiff was explicitly informed that Defendant would not be making payments for up to 16 months. Even if Plaintiff had attempted to rush to the courtroom on day 31, it would still have had no remedy because the payment was not due at that point.

On July 3, 2014, Defendant issued what was intended to be a finalized "Grower Statement" for the 2013 crop year. (7/3/2014 Statement, ECF No. 25-1.) This Grower Statement was based on a price of 8 cents for soft apples and 10 cents for hard apples. It also included a "PUR" charge, described as a "capital call charge," of $30,869.11. (*Id.* at PageID.154.) Based on these numbers, the "net balance due" from Defendant to Plaintiff was set at $120,903.21. (*Id.* at PageID.156.)

On February 2, 2015, Defendant issued a "Revised Grower Statement" for the 2013 crop year. (2/5/2015 Grower Statement, ECF No. 25-12.) The Revised Grower Statement was based on a price of 7 cents for soft apples and 9 cents for hard apples. It also removed the PUR charge that was imposed on Plaintiff. As a result, the "net balance due" from Defendant to Plaintiff was set at $112,841.70. (*Id.* at PageID.235.)

Plaintiff contends that Defendant owes $151,772.32. This amount reflects the removal of the PUR charge, but utilizes the initial target price of 8 cents for soft apples and 10 cents for hard apples. Plaintiff does not dispute that, per the terms of the agreement, Defendant was able to unilaterally adjust the target price. Plaintiff contends, however, that the July 2014 Grower Statement included the finalized price, and that Defendant only reduced that price after litigation began in this matter, resulting in a lesser figure owed by Defendant. At trial, however, Eric MacLeod stated that the decision to reduce the target price occurred in April 2014—three months prior to the erroneous July 2014 Grower Statement's issuance. MacLeod also stated that the July 2014 Grower Statement's failure to reflect the reduced price was a

simple oversight that resulted from internal trauma the company had gone through. MacLeod did not realize that the July 2014 Grower Statement did not reflect the price that Defendant's board of directors had agreed upon in April, and when he realized the mistake, he adjusted the price in the February 2015 Grower Statement.

As Plaintiff does not dispute Defendant's assertion that Defendant had the ability to unilaterally set and adjust the final price, the amount of damages largely comes down to an issue of credibility. The Court finds that MacLeod's testimony that the pricing included in the July 2014 Grower Statement was a result of an oversight, and that the board of directors determined that the target price should be reduced in April 2014 to be credible. Accordingly, the Court will award Plaintiff damages in the amount reflected in the February 2015 Grower Statement.

## IV. Interest and Attorney's Fees

Lastly, as mentioned, the bill of lading also provided that: "Buyer agrees that Interest shall accrue on past due balances at 1.5% (18% per annum). Buyer agrees to pay all costs of collections including attorney fees." Unlike the payment terms–which were expressly discussed and agreed upon between the parties, and conflicted with the bill of lading–interest and attorney's fees were never discussed at all. Thus, Plaintiff never agreed to waive the interest and attorney's fees provision, as it did the 10-day payment term provision.

"Although PACA does not explicitly provide for attorney's fees, interest, and costs, the circuit courts have determined that the broad language of 7 U.S.C. § 499e(c)(2),

specifically the phrase 'sums owing in connection with,' includes a right to attorney's fees, interest, and costs, provided there exists a contractual right to such fees." *La Grasso Bros. Inc. v. Am. Foodservice, L.L.C.*, No. 10-10711, 2011 WL 891221, at *4 (E.D. Mich. Mar. 11, 2011). In *La Grasso*, the court upheld an award of interest when an invoice contained language identical to the bill of lading in this case. *Id.* at *6. As in *La Grasso*, the Court finds that an award of interest and attorney's fees is proper in this matter.

Plaintiff will be directed to provide an updated statement of the interest that has accrued and the attorney's fees incurred. Interest shall accrue from 16 months after the date of the transaction, and shall be based upon a principal amount of $112,841.70. Defendant will have an opportunity to respond.

## V. Conclusion

In sum, the Court finds that Plaintiff did not preserve its PACA trust rights. The PACA "is intended to protect only those produce sellers making short-term credit arrangements." *Overton Distribs.*, 340 F.3d at 365. The arrangement between Plaintiff and Defendant was not a short-term credit arrangement. It allowed Defendant to make payments whenever possible. Plaintiff agreed to do business with Defendant anyway, thus taking the risk that these payments would not be made. Doing so resulted in a waiver of the PACA trust rights. *Id.* at 367. Moreover, the Court finds Eric MacLeod's testimony that the price listed on the July 2014 Grower Statement was the result of an oversight to be credible. Accordingly, the damages owed to Plaintiff for Defendant's breach of contract will be based

on the prices reflected in the February 2015 Grower Statement. Plaintiff is also entitled to attorney's fees and interest, which shall accrue based on the net balance due in the February 2015 Grower Statement.

      A separate order shall issue in accordance with this Opinion.


Dated: <u>May 27, 2016</u>　　　　　　　　　　　　<u>/s/ Robert Holmes Bell</u>
　　　　　　　　　　　　　　　　　　　　　　　ROBERT HOLMES BELL
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE